IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

STATE OF WASHINGTON, )   No. 72734-6-I
)
                Respondent, )
)
        v.                 )   UNPUBLISHED OPINION
)
YUSUF HAISE SHIRE, )
)
                Appellant. )   FILED: January 30, 2017

SCHINDLER, J. — By amended information, the State charged Yusuf Haise Shire

and Mohamed Ibrahim with assault of Mardillo Barnes, Vincent Williams Jr., and Berket

Kebede in the first degree while armed with a firearm and unlawful possession of a

firearm in the first degree. The jury convicted Shire of three counts of the lesser

included offense of assault in the second degree while armed with a firearm and

unlawful possession of a firearm in the first degree. Shire contends he is entitled to

dismissal of the convictions because double jeopardy barred retrial. Shire also seeks

reversal on the grounds that the court erred by denying his motion to suppress custodial

statements and denying his request for a material witness warrant. In the alternative,

Shire asserts his attorney provided ineffective assistance of counsel by failing to timely

request a material witness warrant. In the linked case, State v. Ibrahim, No. 72753-2-I

(Wash. Ct. App. Jan. 30, 2017), we considered and rejected the argument that double

jeopardy barred retrial and that the court erred in denying the request to issue a material witness warrant. In this appeal, we also conclude the court did not err in denying the motion to suppress and Shire cannot show ineffective assistance of counsel.[1] We affirm the jury convictions but remand to correct a scrivener's error in the judgment and sentence.

## Motion to Suppress Custodial Statements

Shire contends the court erred by admitting custodial statements he made to police. Shire asserts the statements were made in response to custodial interrogation. The State asserts the statements were not the result of an interrogation.

Under the Fifth Amendment, "No person shall be . . . compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. In Miranda v. Arizona, 384 U.S. 436, 473-74, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), the Supreme Court adopted "[p]rocedural safeguards" to protect the privilege and require warnings before questioning an individual in custody.[2] If an individual invokes his right to remain silent, the police must cease questioning. Miranda, 384 U.S. at 473-74; State v. Cross, 156 Wn.2d 580, 619, 132 P.3d 80 (2006). However, statements made "freely and voluntarily" are not barred by the Fifth Amendment. Miranda, 384 U.S. at 478.

> Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police

---

[1] The facts are more fully set forth in the linked case, State v. Ibrahim, No. 72753-2-I (Wash. Ct. App. Jan. 30, 2017), and will be repeated only as necessary.

[2] The police must clearly inform the suspect:

[T]hat he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

Miranda, 384 U.S. at 478-79.

> without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.

Miranda, 384 U.S. at 478.

In Rhode Island v. Innis, 446 U.S. 291, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980), the Supreme Court addressed the meaning of "interrogation" under Miranda. The Court concluded "interrogation" under Miranda "refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." Innis, 446 U.S. at 301.[3]

> We conclude that the Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

Innis, 446 U.S. at 300-01;[4] see also In re Pers. Restraint of Cross, 180 Wn.2d 664, 685, 327 P.3d 660 (2014). In determining whether any words or actions of the police are reasonably likely to elicit an incriminating response, we focus "primarily upon the perceptions of the suspect, rather than the intent of the police." Innis, 446 U.S. at 301; see also Cross, 180 Wn.2d at 685; State v. Sargent, 111 Wn.2d 641, 651, 762 P.2d 1127 (1988).

---

[3] Footnote omitted.
[4] Footnote omitted.

3

We review a trial court's findings of fact following a CrR 3.5 hearing for substantial evidence and review de novo whether the findings support the conclusions of law. State v. Radcliffe, 164 Wn.2d 900, 907, 194 P.3d 250 (2008); State v. Broadaway, 133 Wn.2d 118, 131, 942 P.2d 363 (1997); State v. Duncan, 146 Wn.2d 166, 171, 43 P.3d 513 (2002). In determining if police engaged in "interrogation" for Miranda purposes, "we defer to the trial court's findings of fact but review its legal conclusions from those findings de novo." Cross, 180 Wn.2d at 681. Unchallenged findings of fact are verities on appeal. State v. Lorenz, 152 Wn.2d 22, 30, 93 P.3d 133 (2004).

There is no dispute Shire was in custody. The unchallenged findings of fact state:

> 1. THE UNDISPUTED FACTS: The defendants were stopped in a white 1996 Toyota Camry at approximately 1:40 AM on May 18, 2013 after . . . Seattle Police Department officers learned that the Toyota Camry that was suspected to be involved in a shooting that had just occurred. After a felony stop was conducted by several Seattle Police Department officers, all of the occupants were ordered out of the Camry.

There is no dispute Officer Shelley San Miguel read Shire his Miranda rights. Shire stated he understood his rights and "he did not want to speak about the shooting." The unchallenged findings establish Officer San Miguel did not ask Shire any questions. The unchallenged findings of fact state:

> Officer Shelley San Miguel arrived at the location of the stop just as defendant Shire was being removed from the vehicle. The officer contacted defendant Shire, placed him into handcuffs, and walked him back to Officer Elias's patrol vehicle. There, the [officer] apprised defendant Shire of his Miranda warnings. Defendant Shire indicated that he understood, and advised the officers that he did not want to speak about the shooting. He was not asked any further questions about the incident.

But the unchallenged findings of fact establish that "Officer San Miguel did, however, inform defendant Shire of the reason for his arrest." Officer San Miguel told Shire that "the vehicle was a possible suspect vehicle in an incident a few blocks away" and that "we had stopped the vehicle and were detaining all the occupants inside while we conduct an investigation." Shire "then stated that he was not involved in anything and had just been picked up by his friends."

Officer San Miguel was the only witness to testify at the hearing on the admissibility of the custodial statements made by Shire. Officer San Miguel testified that the statement she made to Shire about "why he was being stopped" was not "framed . . . as a question."

The State argued the statements were admissible. The State asserted the testimony established Officer San Miguel read Shire his Miranda rights and Shire exercised his right not "to answer any of the questions." And "after that point," all Officer San Miguel did was inform Shire of "the reason for his arrest."

> All the Officer did after that point was inform Mr. Shire the reason for his arrest; that being that they were investigating some suspicious circumstances involving a shooting. And as the Officer noted, that statement[ ] wasn't intended to — intended to elicit a response, it wasn't a question. It certainly wasn't coerced in any manner. And — and really, the Officer didn't believe that there was going to be any response made by Mr. Shire to that statement.

Shire's attorney argued the question of whether the statement of Officer San Miguel was interrogation is an objective not a subjective determination.

> Innis clearly defines interrogation under Miranda as not only express questioning, but also words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily on the perceptions of the suspect rather than the intent of the police. . . .

5

[T]he standard is an objective one, focusing on what the officer knows or ought to know will be the result of his words and acts. The subjective intentions of the officer are not at issue.

The court ruled Shire was not subject to interrogation and the statements he made were admissible.

When it comes to the statements of Mr. Shire to Officer San Miguel, the issue here is whether Officer San Miguel's statement basically articulating for Mr. Shire the reason for his detention, whether or not that is objectively designed to elicit statements in violation of Miranda. In this particular case I think the statements were innocuous, they were informative only, they weren't intended or designed, or objectively requiring a response on behalf of Mr. Shire.

The written conclusions of law state, in pertinent part:

Statements by Defendant Yusuf Shire: When defendant Shire was taken into custody, he was appropriately apprised of his Miranda warnings and exercised his right to remain silent. Defendant Shire was not questioned thereafter. Officer San Miguel, however, did make an innocuous statement about the reason for the arrest. This statement was not a question, nor was it intended to elicit a response from defendant Shire. As a result, defendant Shire's statement made in response does not implicate the protections afforded by Miranda. Defendant Shire's response was spontaneously and voluntarily made and is admissible for CrR 3.5 purposes.

Shire challenges the conclusion of law on the grounds that the court erred in focusing on Officer San Miguel's subjective intent rather than on the objective determination of whether Officer San Miguel should have known that telling Shire why he was under arrest was likely to elicit an incriminating response. The record does not support Shire's argument.

The written conclusions of law specifically incorporate by reference the "oral findings and conclusions." The court's oral ruling clearly shows the court applied the correct standard in determining whether Officer San Miguel's statement was objectively likely to elicit an incriminating response. The court expressly states that it considered

"whether Officer San Miguel's statement basically articulating for Mr. Shire the reason for his detention, whether or not that is objectively designed to elicit statements in violation of Miranda."[5] The court ruled the officer's statements "were informative only, they weren't intended or designed" to "objectively" require a response from Shire. The record also does not support the argument that telling Shire why he was under arrest was reasonably likely to elicit an incriminating response.

Because the court used an objective standard in concluding Shire's statement to Officer San Miguel was not the product of interrogation, the court did not err in admitting the statement Shire made to police. See United States v. Crisco, 725 F.2d 1228, 1232 (9th Cir. 1984).

Ineffective Assistance of Counsel

Shire contends his attorney provided ineffective assistance of counsel by failing to timely request a material witness warrant for Kebede.

"Ineffective assistance of counsel is a fact-based determination, and we review the entire record in determining whether a defendant received effective representation at trial." State v. Carson, 184 Wn.2d 207, 215-16, 357 P.3d 1064 (2015); State v. Grier, 171 Wn.2d 17, 34, 246 P.3d 1260 (2011). Shire bears the burden of establishing that defense counsel's performance fell below the standard of reasonableness and was "deficient," and that deficient performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); State v. Bowerman, 115 Wn.2d 794, 808, 802 P.2d 116 (1990) (adopting the standards in Strickland). If a defendant fails to establish either prong, we need not inquire further.

---

[5] Emphasis added.

7

Strickland, 466 U.S. at 697; State v. Hendrickson, 129 Wn.2d 61, 78, 917 P.2d 563 (1996).

Shire cannot show deficient performance. "Deficient performance is performance falling 'below an objective standard of reasonableness based on consideration of all the circumstances.'" State v. Kyllo, 166 Wn.2d 856, 862, 215 P.3d 177 (2009) (quoting State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995)). An appellate court must indulge in a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and the presumption of a legitimate trial strategy. Strickland, 466 U.S. at 689. To rebut the presumption that counsel's performance was reasonable, Shire "bears the burden of establishing the absence of any 'conceivable legitimate tactic explaining counsel's performance.'" Grier, 171 Wn.2d at 42[6] (quoting State v. Reichenbach, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)); State v. Humphries, 181 Wn.2d 708, 720, 336 P.3d 1121 (2014); McFarland, 127 Wn.2d at 335-36.

Shire cannot show the decision not to request a material witness warrant before the last day of trial fell below the objective standard of reasonableness based on the circumstances.

The second trial began on September 3, 2014. The State filed a motion to amend the information to add a charge of assault of Berket Kebede in the first degree while armed with a firearm. On September 4, the State served Kebede with a subpoena to appear and testify at trial. During pretrial motions, Shire's attorney described the "pros and cons" of calling Kebede as a defense witness. "Certainly the concerns that I had were there were a number of jail calls, as the State has pointed out, between my

---

[6] Emphasis in original.

8

client and Mr. Kebede." The attorney told the court there were allegations of witness tampering.

> [T]here have been allegations of — of witness tampering. I know there's a letter in evidence that the prior trial court permitted, that I anticipate will be permitted to be used at this trial, regarding that alleged witness tampering.

The defense "also knew, and understood at the time, that it was likely that Mr. Kebede would be added as a third victim to the shooting. So it would expose my client to additional criminal liability."

Mardillo Barnes testified on September 9. During cross-examination, Barnes admitted he previously testified that he did not "see who did the shooting." Barnes testified he knew Shire and did not remember seeing or talking to Shire that evening.

On September 11, the prosecutor told the court that because "we're not able to locate [Kebede]," the State did not intend "at this point to introduce any of the jail calls" that Shire "made to Mr. Kebede."

> [W]e're not able to locate him, so it doesn't — we don't anticipate him being called as a witness — calling him as a witness. They — some of these calls could potentially be used as impeachment evidence against him.

The State planned to conclude its case on September 16. When the trial reconvened on September 16, Detective Thomas Janes testified about the attempts he made during the trial to locate Kebede including speaking to his mother. Detective Janes said Kebede's mother had talked to Kebede "earlier in the week" but she did not provide "any information of his location." Detective Janes also read a letter Shire wrote while in jail. The letter states the case against him turns on the testimony of the victims

and if "the victims don't come," he will be convicted of only unlawful possession of a firearm.[7]

During the recess, the court asked the defense for an update—"where we'll go next." Shire's attorney asked the court to "give the defense until tomorrow morning" to locate Kebede. The attorney told the court that he and the investigator had made "efforts to find him." The attorney said he left Kebede "a message saying that if — if he was going to testify on behalf of the defense . . . that we would need him here tomorrow morning." The prosecutor said in that event, the State planned to call Kebede as a witness. The court ruled the State could "either rest and let the defense call [Kebede], or you can call him and see where that takes us."

Shire's attorney also told the court that he planned to call the defense investigator to rebut the implication that Shire had paid Kebede to leave town and not testify. The court ruled:

> Well he can certainly testify to having contact with Mr. Kebede in December of 2013. He'd not relocated to California where he was receiving a thousand dollars a month or anything like that. He was here in King County, Washington in December of 2013.

The court asked the defense attorney what were "the chances of [Kebede] coming in tomorrow morning." Shire's attorney responded that "from my perspective,

---

[7] The letter states, in pertinent part:

What's up, Samira? . . . [M]y case is looking kind of bad right now that they pushed it back 'til October. And they got my prints on the gun. But really, my case relies on the victims. If the victims don't come, I will get charged with the gun. That's why I'm stressing really. So far they can't get a hold of none of the victims or the witness.

But yeah, I need you . . . to take Oh Boy out of town to Cali and give him like one thousand a month to live until my shit is over with 'cause if they find him and he comes, I'm cooked. Bad. That's why I need you to do that, because with him I . . . should be good. 'Cause they are — are looking for him.

. . . they're slim."

> I've left messages, [the defense investigator] went out and talked to his mom that — basically what we conveyed to him was the case will be over tomorrow. I — I have no idea if he's going to show up.

Ibrahim's attorney then disclosed that she received a call from Kebede that day and he said he "would be here at 8:30" tomorrow morning.

> [IBRAHIM'S ATTORNEY]: And your Honor, this is perhaps why I need to then disclose this. And that is just at the lunch hour, I did get a call from Mr. Kebede —
> THE COURT: Okay.
> [IBRAHIM'S ATTORNEY]: — in response to my telephone calls.
> THE COURT: Uh huh.
> [IBRAHIM'S ATTORNEY]: Mr. Kebede — I told him he would need to be here at 8:30 tomorrow morning.
> THE COURT: Yeah.
> [IBRAHIM'S ATTORNEY]: He indicated he would be here at 8:30.

The next morning on September 17, Shire's attorney told the court that Kebede called at approximately 7:45 a.m. Kebede acknowledged receiving the subpoena from the defense and said he "would be here at 9:00" a.m. The court ruled Shire could present the testimony of the defense investigator.

> Well we can bring in the jury, the State can rest. We can hear from [the defense investigator], and that will give us until 9:30 or 9:40 to see if Mr. Kebede should appear. If he has not appeared, then would you be resting?

Shire's attorney told the court that if Kebede did not appear by 9:40 a.m., he would ask the court to issue a material witness warrant.

> [SHIRE'S ATTORNEY]: I — I think the only other thing that I would have would be a motion for material witness warrant. Unfortunately the service information is, as I've described to the Court, and — and that's all that I can offer the Court in terms of a basis for that.
> THE COURT: Okay.
> [SHIRE'S ATTORNEY]: But — but I — I think I would be obliged to ask.

THE COURT: Okay. And I think I would probably, in light of the timing, be obliged to decline that —

[SHIRE'S ATTORNEY]: That's not a surprise.

THE COURT: — invitation. You know, I might have a week ago, which is, I think, what Detective Janes might have had the impression had occurred. There was not a warrant for Mr. Kebede?

The prosecutor told the court that "there actually is a warrant for Mr. Kebede's arrest" in municipal court.

The court denied Shire's request to issue a material witness warrant. The State rested. The defense called their investigator to testify. Kebede did not come to court to testify.

Shire cannot show deficient performance in failing to request a material witness warrant sooner. There is no dispute that Kebede received a subpoena to testify and that until Kebede did not appear on September 17, there was no justification to request a material witness warrant. See CrR 4.10.[8] Kebede told the defense the day before that he would come to court the next morning. The next morning, Kebede talked to Shire's attorney and confirmed he planned to come to court and testify.

The record also shows legitimate strategic reasons to not delay the trial to locate Kebede. Barnes testified he knew Shire, and Shire was not involved in the shooting. There is no dispute the State would have impeached Kebede's credibility by introducing evidence including that Kebede was in regular contact with Shire while he was in jail, that Kebede was in court during the first trial, and that he did not come forward until

---

[8] CrR 4.10(a) states, in pertinent part:

The [material witness] warrant shall issue only on a showing . . . that

    (1) The witness has refused to submit to a deposition ordered by the court pursuant to rule 4.6; or

    (2) The witness has refused to obey a lawfully issued subpoena; or

    (3) It may become impracticable to secure the presence of the witness by subpoena.

12

after Williams testified. Further, without Kebede's testimony, the State would not introduce the jails calls between Kebede and Shire or question Kebede about the letter Shire wrote.

Because Shire cannot establish deficient performance, his claim of ineffective assistance of counsel fails. Strickland, 466 U.S. at 697; Hendrickson, 129 Wn.2d at 78; Carson, 184 Wn.2d at 229.

Statement of Additional Grounds

In his pro se statement of additional grounds, Shire claims his attorney provided ineffective assistance of counsel by not asking Williams about being "pressured into testifying against me" and about the information Williams obtained after the shooting "from friends and family." Shire cannot show ineffective assistance of counsel. Shire's attorney engaged in a lengthy cross-examination of Williams, and we presume decisions regarding the extent of cross-examination are strategic. See In re Pers. Restraint of Brown, 143 Wn.2d 431, 451, 21 P.3d 687 (2001); State v. Stockman, 70 Wn.2d 941, 945, 425 P.2d 898 (1967).[9]

Scrivener's Error in Judgment and Sentence

Shire contends the judgment and sentence incorrectly lists assault in the first degree instead of assault in the second degree. The State concedes the judgment and sentence mistakenly lists assault in the first degree. We accept the State's concession

---

[9] Shire also contends that because Kebede did not testify, he was deprived of his constitutional right to confront Kebede and present a defense. Because appellate counsel "addressed" this argument, we need not address Shire's argument. RAP 10.10(a); State v. Thompson, 169 Wn. App. 436, 493, 290 P.3d 996 (2012) (alleged error thoroughly addressed by counsel not proper matter for statement of additional grounds).

13

as well taken and remand to correct the judgment and sentence.  In re Pers. Restraint Petition of Mayer, 128 Wn. App. 694, 701-02, 117 P.3d 353 (2005).

We affirm the jury conviction but remand to correct the scrivener's error in the judgment and sentence.

WE CONCUR: