IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>        Respondent,<br><br>   v.<br><br>JESSE RANDALL ACKERMAN,<br><br>        Appellant. | No. 77807-2-I<br><br>DIVISION ONE<br><br>OPINION PUBLISHED IN PART<br><br><br>FILED: December 2, 2019 |

CHUN, J. — The State charged Ackerman with second degree murder. At trial, Ackerman claimed self-defense. The trial court did not give the pattern jury instruction, WPIC 16.03,[1] regarding "Justifiable Homicide – Resistance to Felony." Instead, it modified the instruction by replacing "felony" with "violent felony" and gave an additional instruction that "Robbery is a felony." The trial court also modified the pattern instruction by adding a requirement that the "slayer reasonably believed that the violent felony threatens imminent danger of death or great personal injury[.]" The jury convicted Ackerman as charged.

In the published portion of this opinion, we hold that the jury instructions failed to make the law of self-defense manifestly apparent to the average juror. Accordingly, we reverse and remand for a new trial.

---

[1] 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 16.03 (4th ed. 2016) (WPIC).

In the unpublished portion of this opinion, we conclude that (1) the State violated CrR 3.1 by not advising Ackerman of his right to an attorney immediately upon his arrest, (2) the trial court did not abuse its discretion by admitting the videotape depicting Ackerman in handcuffs, and (3) the trial court's comments, as well as the admission of Ackerman's statements, regarding his potential sentence constituted error.

## I.      BACKGROUND[2]

On December 9, 2016, Ackerman drove to Erica Rogers's home to sell heroin to her. When Ackerman arrived, he parked his Mustang outside her house. The two then smoked heroin in the car. Afterwards, Rogers left and Ackerman smoked a cigarette. Ackerman fell asleep in his car for around two to three hours.

Susan Keating, one of Rogers's neighbors, saw the Mustang parked on the street as she arrived home. Keating noticed that the car's right turn signal, windshield wipers, and headlights were on and that the engine was running. About 40 minutes later, when Keating got back in her vehicle, she saw the Mustang in the same condition. Keating honked at the Mustang as she drove by. The driver did not respond. Keating called 911.

After speaking with 911, Keating called her daughter, Julie Presteen, who lived with her and was at home. Keating asked Presteen if she knew who owned

---

[2] This opinion discusses additional facts and procedural history in the Analysis section below where pertinent.

the Mustang. Presteen said she did not know. Keating told Presteen that the police were on their way.

Presteen then texted Rogers saying that if she knew the owner of the Mustang, she should tell them to leave because Presteen's mother had called the police. Presteen also told her boyfriend, Ryan Osborne, about the Mustang and her mother calling the police. Osborne also lived at Keating's house.

Rogers called Ackerman but he did not answer his phone. As Rogers was out shopping, she texted Presteen that she should wake Ackerman.

According to Presteen, Osborne left the home to tell Ackerman that the police were coming. She went outside to smoke a cigarette on the driveway of her home. Presteen saw Osborne standing at the driver's door of the Mustang. She then saw Osborne running back towards the house in a "zigzag" pattern. She next heard a "loud pop." Presteen lost sight of Osborne momentarily and then saw him lying on the ground. Ackerman had shot Osborne.

Presteen ran to Osborne. She turned him onto his back, held him in her arms, and tried to wake him. Presteen testified that Ackerman got "right in [her] face" and said, "Oh, he's all right. He's going to be all right." Presteen asked Ackerman "what the fuck he did" and told him to "[g]et away." She said Ackerman then "took off." Presteen yelled at Osborne's mother, who also lived with them, to call 911.

The bullet had traveled through Osborne's back and struck his lungs and aorta. Osborne lost consciousness within seconds and died within minutes of being shot.

The State charged Ackerman with second degree murder with a firearm allegation. Ackerman claimed self-defense.

At trial, Ackerman testified as follows: After falling asleep in his car, he "sensed movement" and woke up to Osborne pointing a gun at him. Osborne demanded he hand over "whatever" he had or be shot. Osborne then reached through the open driver's-side window to grab a bag of heroin and a money clip off of the dashboard and pushed Ackerman back. Ackerman believed Osborne saw he had a gun when Osborne pushed him back. Osborne then hit him on the side of the head with Osbourne's own gun. In response, Ackerman opened his car door and hit Osborne with it. Osborne turned away from him. Ackerman heard Osborne slide the rack on his gun as if preparing to shoot. Ackerman fired his gun at Osborne. He was not sure whether the bullet had struck Osborne. As Ackerman approached, Presteen ran to Osborne. Presteen crouched down, picked up Osborne's gun, and yelled, "What the fuck did you do? Get out of here." Ackerman then put his hands up, backed away, and drove off in his car.

On October 5, 2017, the jury convicted Ackerman as charged. Ackerman appeals.

## II.    ANALYSIS

### A. Jury Instructions

Ackerman argues that the trial court erred by inaccurately instructing the jury on self-defense. The State contends that Ackerman waived this objection and that his claim lacks merit. We reject the State's waiver argument and

4

conclude that the trial court erred by giving instructions that failed to make the self-defense standard manifestly apparent to the average juror.

1.    Waiver

The State asserts that Ackerman waived his right to challenge the jury instructions on appeal because "[t]he defendant did not object or take exception to Instruction 23 (WPIC 16.03) . . . as given to the jury." We determine that Ackerman may raise the issue on appeal.

Even if a party fails to raise an issue below, RAP 2.5(a)(3) permits us to review an alleged manifest error that affects a constitutional right. State v. Sublett, 176 Wn.2d 58, 78, 292 P.3d 715 (2012). We analyze unpreserved claims of error regarding self-defense instructions on a case-by-case basis to determine whether they constitute a manifest constitutional error. State v. O'Hara, 167 Wn.2d 91, 104, 217 P.3d 756 (2009). "To determine whether manifest constitutional error was committed there must be a plausible showing by the appellant that the asserted error had practical and identifiable consequences." State v. A.M., 194 Wn.2d 33, 38, 448 P.3d 35 (2019) (internal quotation marks and citation omitted). An appellant meets this requirement if they make a plausible showing that the error resulted in actual prejudice. A.M., 194 Wn.2d at 38.

Here, Ackerman challenges Instructions 23 and 24, claiming they enabled an erroneous interpretation regarding the requirements of self-defense. He asserts that the instructions (1) indicated that defending against a robbery would

not justify the use of deadly force, and (2) included a "reasonable belief" standard in contradiction of the statute.

Due process requires the State to prove every element of a charge beyond a reasonable doubt. State v. Johnson, 100 Wn.2d 607, 614, 674 P.2d 145 (1983), overruled on other grounds by State v. Bergeron, 105 Wn.2d 1, 711 P.2d 1000 (1985). Here, the alleged errors in the jury instructions potentially diluted the State's burden by incorrectly conveying the elements of self-defense. Thus, Ackerman raises an error affecting a constitutional right. And he makes a plausible showing that presenting an incorrect standard for self-defense had practical and identifiable consequences on the jury's deliberations. See Johnson, 100 Wn.2d at 614 ("Constitutional error may be raised for the first time on appeal (RAP 2.5(a)) and this is particularly true of error affecting such fundamental aspects of due process as the presumption of innocence and the right to have the State prove every element of the charge beyond a reasonable doubt."). As such, Ackerman raises a manifest error affecting a constitutional right that we will review regardless of whether he objected below.[3]

---

[3] Even so, Ackerman likely preserved the issue for appeal. "The pertinent inquiry on review is whether the exception [to the instruction] was sufficient to apprise the trial judge of the nature and substance of the objection." Washburn v. City of Federal Way, 178 Wn.2d 732, 746, 310 P.3d 1275 (2013) (internal quotation marks and citation omitted). At trial, the parties and court had extended discussions about the self-defense instructions. Ackerman told the court that the instructions should convey to the jury that Washington law allows a person to confront a robber with deadly force. Ackerman also stated that if the court added "violent" felony to the instruction, then an instruction should indicate that robbery is a violent felony. Based on these discussions, the court likely understood the nature of Ackerman's objection. See, e.g., Washburn, 178 Wn.2d at 747 ("We reviewed the trial record, found 'extended discussions' about the jury instructions, and determined that the trial court understood the nature of [the defendant's] objection.").

2.    Merits of the Claimed Instructional Error

Ackerman asserts that the trial court's modifications to WPIC 16.03 and its

instruction that "Robbery is a felony" "diluted the State's burden of disproving

justifiable homicide and confused the necessary elements for the jury." The

State claims the court modified the pattern instruction to correctly convey the

case law. We conclude the trial court erred by giving the instructions.

At trial, Ackerman asked "the Court to instruct on both [WPIC 16.02 and

WPIC 16.03] or create a hybrid instruction that addresses both."[4] WPIC 16.03

provides as follows:

> Justifiable Homicide—Resistance to Felony
>
> It is a defense to a charge of [murder] [manslaughter] that the homicide was justifiable as defined in this instruction.
>
> Homicide is justifiable when committed in the actual resistance of an attempt to commit a felony [upon the slayer] [in the presence of the slayer] [or] [upon or in a dwelling or other place of abode in which the slayer is present].
>
> The slayer may employ such force and means as a reasonably prudent person would use under the same or similar conditions as they reasonably appeared to the slayer, taking into consideration all the facts and circumstances as they appeared to [him] [her] at the time [and prior to] the incident.
>
> The State has the burden of proving beyond a reasonable doubt that the homicide was not justifiable. If you find that the State has not proved the absence of this defense beyond a reasonable doubt, it will be your duty to return a verdict of not guilty.

WPIC 16.03 is based on RCW 9A.16.050(2), which provides that

"[h]omicide is also justifiable when committed . . . [i]n the actual resistance

---

[4] WPIC 16.02 is the pattern jury instruction for "Justifiable Homicide—Defense of Self and Others." The court separately gave this pattern jury instruction verbatim and Ackerman does not challenge the instruction on appeal.

of an attempt to commit a felony upon the slayer, in [their] presence, or upon or in a dwelling, or other place of abode in which [they are]."

However, the trial court apparently believed that the pattern instruction did not adequately convey legal standards in case law. Accordingly, it gave the following modified WPIC 16.03 instruction, Instruction 23, which added that the slayer must be resisting a "violent felony" and that they must have reasonably believed they were in imminent danger of death or great personal injury:

> It is a defense to a charge of murder or manslaughter that the homicide was justifiable as defined in this instruction.
>
> Homicide is justifiable when:
>
> (1) The homicide is committed in the actual resistance of an attempt to commit a *violent* felony upon the slayer;
>
> (2) *The slayer reasonably believed that the violent felony threatens imminent danger of death or great personal injury; and*
>
> (3) The slayer *employed* such force and means as a reasonably prudent person would use under the same or similar conditions as they reasonably appeared to the slayer, taking into consideration all the facts and circumstances as they appeared to him at the time of and prior to the incident.
>
> The State has the burden of proving beyond a reasonable doubt that the homicide was not justifiable. If you find that the State has not proved the absence of this defense beyond a reasonable doubt, it will be your duty to return a verdict of not guilty.

(Emphasis added to show deviations from WPIC 16.03.) Given this modification to the pattern instruction, Ackerman asked for an additional instruction providing that robbery constitutes a violent felony. The court refused and instead gave an instruction providing, "Robbery is a felony."

We review de novo a claim of instructional error. Sublett, 176 Wn.2d at 78.

8

"Jury instructions must more than adequately convey the law of self-defense." State v. Corn, 95 Wn. App. 41, 52, 975 P.2d 520 (1999). When read as a whole, "the jury instructions must make the relevant legal standard manifestly apparent to the average juror." Corn, 95 Wn. App. at 53. "In normal usage, 'manifest' means unmistakable, evident or indisputable, as distinct from obscure, hidden or concealed." State v. Lynn, 67 Wn. App. 339, 345, 835 P.2d 251 (1992) (citing State v. Taylor, 83 Wn.2d 594, 596, 521 P.2d 699 (1974)). Once a defendant raises evidence to support a self-defense instruction, the State must prove the absence of self-defense beyond a reasonable doubt. State v. Brightman, 155 Wn.2d 506, 520, 122 P.3d 150 (2005).

      a.     Instructions 23 and 24

Ackerman claims that the trial court erred in using the term "violent felony" in Instruction 23 and stating only that "[r]obbery is a felony" in Instruction 24, thus conveying that robbery may not constitute a type of felony that is a predicate for justifiable homicide. We agree.

The two instructions read together do not make the self-defense standard manifestly apparent. The instruction that "[r]obbery is a felony" permits an erroneous interpretation that robbery could not constitute a violent felony that could warrant one to use deadly force in self-defense. While the jury may have been able to discern the correct legal standard, a trial court has not made a legal standard manifestly apparent when it provides instructions subject to two reasonable interpretations—one correct and one incorrect. See State v. LeFaber, 128 Wn.2d 896, 900-01, 913 P.2d 369 (1996).

9

The instructions failed to make the law of self-defense manifestly apparent to the average juror. By suggesting that a robbery may not satisfy the requirements of a justifiable homicide defense because it does not qualify as a violent felony, the instructions diluted the State's burden of proving the absence of self-defense beyond a reasonable doubt.

        b.     Adding Reasonable Belief of "Imminent Danger of Death or Great Personal Injury"

Ackerman further argues that the trial court erred by adding, "The slayer reasonably believed that the violent felony threatens imminent danger of death or great personal injury" to Instruction 23. We agree.

RCW 9A.16.050 provides subsections (1) and (2) in the disjunctive, using the term "or":

> Homicide is also justifiable when committed either:
>
> (1) In the defense of the slayer, or [their] husband, wife, parent, child, brother, or sister, or of any other person in [their] presence or company, when there is reasonable ground to apprehend a design on the part of the person slain to commit a felony or to do some great personal injury to the slayer or to any such person, and there is imminent danger of such design being accomplished; *or*
>
> (2) In the actual resistance of an attempt to commit a felony upon the slayer, in [their] presence, or upon or in a dwelling, or other place of abode in which [they are].

(Emphasis added.)

While subsection (1) concerns justifiable homicide in the defense of self and others, subsection (2) regards justifiable homicide in resistance to a felony. Although subsection (1) requires, in part, "some great personal injury to the slayer or to any such person" and "imminent danger of such design being

10

accomplished," subsection (2) does not contain such language. Given the disjunctive structure of the statute, the requirements of great personal injury and imminent danger in subsection (1) do not relate to subsection (2).

Though case law does require that the use of force in response to a felony be reasonable,[5] WPIC 16.03 encompasses this requirement by providing that "[t]he slayer may employ such force and means as a reasonably prudent person would use under the same or similar conditions as they reasonably appeared to the slayer." By requiring the jury to also consider, in an instruction based on only subsection (2), whether there was a reasonable belief of imminent danger of death or great personal injury, the instruction misstated the requirements of RCW 9A.16.050(2). Accordingly, it failed to make the applicable legal standards manifestly apparent to the average juror.

"An error affecting a defendant's self-defense claim is constitutional in nature and requires reversal unless it is harmless beyond a reasonable doubt." State v. Arth, 121 Wn. App. 205, 213, 87 P.3d 1206 (2004). Here, the court's instructions did not make the law of self-defense manifestly apparent to the average juror. And Ackerman's only asserted defense at trial was self-defense. We cannot determine that the instructional errors were harmless beyond a reasonable doubt. Indeed, the State does not argue that any errors were harmless. We reverse and remand for a new trial.

The panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder

---

[5] Brightman, 155 Wn.2d at 521.

having no precedential value shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

Unpublished Text Follows

We address the following issues in the unpublished portion of the opinion, which analysis may assist the trial court on remand.

B. CrR 3.1

Ackerman asserts that the police violated CrR 3.1 by not advising him of his right to counsel immediately upon his arrest. The State claims the trial court properly determined that no violation of CrR 3.1 occurred. We agree with Ackerman.

Here, the police arrested Ackerman around 11:30 p.m. Inside a patrol vehicle, an officer advised Ackerman of his right to remain silent and his right to an attorney, but did not provide the full Miranda[6] warnings. The police brought Ackerman to the interview room around 12:20 a.m. The detectives spoke with Ackerman around 12:36 a.m. and read him his Miranda rights. Ackerman invoked his right to counsel and a detective called a public defender at about 12:44 a.m.

We review de novo the application of court rules. Basin Paving Co. v. Contractors Bonding & Ins. Co., 123 Wn. App. 410, 414, 98 P.3d 109 (2004).

The Fifth and Sixth Amendments of the United States Constitution, made applicable to the states through the Fourteenth Amendment, provide a right to counsel. State v. Templeton, 148 Wn.2d 193, 207, 59 P.3d 632 (2002). But CrR

---

[6] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

3.1 "goes beyond the requirements of the Constitution." Templeton, 148 Wn.2d

at 211. Under CrR 3.1, the police must advise a defendant of their right to an

attorney as soon as feasible:

>    (a) Types of Proceedings. The right to a lawyer shall extend to all criminal proceedings for offenses punishable by loss of liberty regardless of their denomination as felonies, misdemeanors, or otherwise.
>
>    (b) Stage of Proceedings.
>
>    (1) The right to a lawyer shall accrue as soon as feasible after the defendant is taken into custody, appears before a committing magistrate, or is formally charged, whichever occurs earliest.
>
>    (2) A lawyer shall be provided at every stage of the proceedings, including sentencing, appeal, and post-conviction review. A lawyer initially appointed shall continue to represent the defendant through all stages of the proceedings unless a new appointment is made by the court following withdrawal of the original lawyer pursuant to section (e) because geographical considerations or other factors make it necessary.
>
>    (c) Explaining the Availability of a Lawyer.
>
>    (1) When a person is taken into custody that person shall immediately be advised of the right to a lawyer. Such advice shall be made in words easily understood, and it shall be stated expressly that a person who is unable to pay a lawyer is entitled to have one provided without charge.
>
>    (2) At the earliest opportunity a person in custody who desires a lawyer shall be provided access to a telephone, the telephone number of the public defender or official responsible for assigning a lawyer, and any other means necessary to place the person in communication with a lawyer.

Courts have determined that the rule's requirement that the police advise a

defendant of their right to a lawyer "as soon as practicable" after arrest means

"immediately." Templeton, 148 Wn.2d at 211.

Thus, CrR 3.1 "requires that a suspect be advised of the right to counsel

as soon as feasible and if legal assistance is requested, access must be

provided." State v. Teller, 72 Wn. App. 49, 54, 863 P.2d 590 (1993). That an advisement of the right to counsel complies with Miranda does not alone demonstrate that the police have met the requirements of CrR 3.1. State v. Kirkpatrick, 89 Wn. App. 407, 414, 948 P.2d 882 (1997). But CrR 3.1 does not require warnings in addition to what Miranda requires. Teller, 72 Wn. App. at 54. Additionally, the rule "does not necessarily compel police to postpone routine prebooking procedures or the execution of a search warrant when an arrestee expresses the desire to consult an attorney." State v. Mullins, 158 Wn. App. 360, 369-70, 241 P.3d 456 (2010).

Here, the police did not advise Ackerman of his constitutional rights to counsel immediately upon his arrest. Though the State cites case law holding that the police need not interrupt prebooking procedures or the execution of a search warrant to obtain counsel for a defendant, the State does not explain why it was not feasible to immediately advise Ackerman of his right to counsel in this case. Indeed, the police did not book Ackerman until after the interview terminated and the only search that occurred prior to the advisement was a search of Ackerman's person incident to arrest. Because, on this record, it was apparently practicable for the police to advise Ackerman of his right to counsel immediately upon his arrest, we determine that the failure to do so violated CrR 3.1.

C. Admission of Video Recording

Ackerman claims the trial court erred by admitting a portion of a videotape showing him in handcuffs because it was unduly prejudicial. While we share

14

Ackerman's concerns that the jury viewed more of the video than was necessary, we conclude the trial court did not manifestly abuse its discretion.

The original videotape the State offered into evidence was 25 minutes long. Almost the first 18 minutes of the videotape portrayed Ackerman "nodding off" while sitting alone in the room in handcuffs. The defense objected to this portion of the videotape on relevance grounds, and the State countered that it was relevant to show Ackerman's mental state. After watching the videotape, the court ruled that the State could play one to three minutes of the portion showing Ackerman alone in the interview room.

We review a trial court's ruling on the admissibility of evidence for a manifest abuse of discretion. State v. Johnson, 185 Wn. App. 655, 670, 342 P.3d 338 (2015). We will overturn the trial court's determination of relevance or prejudice only if no reasonable person would adopt the same view as the court. Johnson, 185 Wn. App. at 670-71.

Under ER 403, relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

Believing that the portion showing Ackerman waiting for the detectives was relevant to showing his mental state, the court admitted three minutes of the footage. That the detectives immediately removed Ackerman's handcuffs when they arrived reduced the prejudicial impact of the evidence. Additionally, that the jury knew the police had arrested Ackerman reduced the prejudicial impact of

15

seeing him in handcuffs during the video. See State v. Rivers, 129 Wn.2d 697, 712, 921 P.2d 495 (1996) (upholding trial court's determination that a mugshot from the crime for which the defendant was on trial was not unduly prejudicial because the jury knew the police had arrested the defendant for the crime). Despite our concerns about the videotape, we determine that, given the deferential manifest abuse of discretion standard, the trial court did not err by admitting a portion of it. See Rivers, 129 Wn.2d at 710 (stating trial courts have wide discretion when deciding whether to admit a mugshot).

D. Comments on Sentencing

Ackerman asks the panel to reverse his conviction based on two comments made at trial relating to his potential sentence. Specifically, he challenges the court informing the jury that his case was not a capital case and the admission of an audio recording in which Ackerman incorrectly said his minimum sentence was 120 months. The State argues only that the statements did not prejudice Ackerman.

During voir dire, the court discussed with the jurors whether they could be fair and impartial. Juror 15 stated that if the case involved capital punishment, they would be biased because they do not believe in the death penalty. The court then stated that this was not a capital case:

> The Court: O.K.
>
> I can let you know this is not a capital case. And jurors have nothing to do with punishment. That's my job. So all you're being asked to do is to side -- the prosecutor's going to ask you to find guilt, and the defense is going to ask you to find not guilty. And you're going to need to follow the Court's instructions about that.

16

The defense did not object.

Then, at trial, the State offered a jail call in which Ackerman stated he "fucked up." The defense objected because Ackerman discussed his potential penalty in the call and gave "misinformation" about what the mandatory minimum was. The court admitted a portion of the recording and played the following conversation for the jury:

| | |
|---|---|
| Jesse Ackerman: | I mean, I'm staying, I'm staying positive, did you, did my lawyer tell you what my minimum is? |
| Unknown: | No, but I, I already know what the minimum . . . |
| Jesse Ackerman: | Hundred, hundred and twenty months. |
| Unknown: | Yeah, I already know, that's the mandatory minimum for your charge. |
| Jesse Ackerman: | For, for no points. |
| Unknown: | Yeah. That's still ten years, dude. |
| Jesse Ackerman: | Yeah, I know. I know. It's alright. I mean, I'm trying to stay positive, dude. I'm fucking, I fucked up. |

As our Supreme Court held in State v. Townsend, "the jury in a noncapital case may not be informed about the penalty for the charged crime." 142 Wn.2d 838, 842, 15 P.3d 145 (2001). Both the trial court's statement that this was not a capital case and the recording where Ackerman discussed his potential sentence informed the jury, albeit inaccurately with regard to the recording, about the penalty for the charged crime. We accept the State's concession that these constituted error.

## III. CONCLUSION

We determine the trial court erred by giving jury instructions that failed to make the self-defense standard manifestly apparent to the average juror. Accordingly, we reverse Ackerman's conviction and remand for a new trial.

_____ Chun, J.

WE CONCUR:

_____
Smith, J.

_____
Dwyer, J.